# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 13, 2010

No. 08-40890

Lyle W. Cayce
Clerk

In the Matter of:  TEXAS COMMERCIAL ENERGY

Debtor

-----------------------------------------------------------

ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.

Appellant

v.

LEO LEONARD MAY

Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and GARZA and STEWART, Circuit Judges.
EDITH H. JONES, Chief Judge:

Leo Leonard May and Texas Commercial Energy ("TCE") sued the Electric Reliability Council of Texas ("ERCOT") for drawing down a letter of credit in violation of a bankruptcy court order and confirmed reorganization plan that allegedly prevented ERCOT from taking that action to satisfy pre-confirmation debts.  The final judgment awarded contract damages and attorneys fees to the Appellees.  ERCOT now appeals, asserting that it had the right to draw down

No. 08-40890

the letter of credit to pay TCE's post-confirmation debts. We agree, and accordingly REVERSE and RENDER the judgment in favor of May.[1]

## I. BACKGROUND

In 2002, Texas deregulated its energy markets. Customers could choose to purchase electricity from a variety of retail electric providers. Retail electric providers purchased electricity wholesale from ERCOT, the entity that manages the electric grid and market for electricity in the state. TCE, one of the first retail electricity providers, purchased electricity from ERCOT pursuant to a contract, the Qualified Scheduling Entity Agreement (the "QSE Agreement"). Electricity cannot be stored, so TCE purchased electricity on a daily basis. Because of volatility in both the price of electricity and the quantity of electricity demanded, TCE's daily charges could vary considerably. To address this inherent volatility, the QSE Agreement required TCE to post standby letters of credit to guarantee payment. As a new company in a newly deregulated industry, however, TCE soon began to falter. In March 2003, due to large swings in the price of electricity, TCE was about to default on approximately $30 million in unpaid ERCOT invoices and filed for Chapter 11 bankruptcy.

TCE continued to operate while in bankruptcy. To continue purchasing electricity from ERCOT, TCE needed to assume the QSE Agreement. *See generally* 11 U.S.C. § 365. After negotiations, the bankruptcy court allowed TCE to assume the QSE Agreement subject to court-ordered modifications (the "September Order"). In pertinent part, the September Order implemented the contractual modifications, stating:

> ORDERED that Debtor [TCE] is hereby authorized to assume the pre-petition Qualified Scheduling Entity Agreement with ERCOT, modified as follows:

---

[1] TCE's Trustee and ERCOT settled pending appeal.

> 1.  Defendant ERCOT is prohibited from directly or indirectly . . .
> (i) taking any further action to collect the [unpaid invoices] . . . ,
> (ii) drawing down any Letter of Credit securing the obligation
> represented by those invoices, (iii) otherwise taking any action to
> facilitate the collection or payment of those [unpaid invoices] and/or
> the obligation reflected therein, or (iv) the foreclosure of any
> collateral securing payment of those Invoices or the obligation
> reflected by them except as authorized by further order of this court.

The overall effect of the September Order was to prevent ERCOT from enforcing any rights in collateral to satisfy the unpaid invoices.  ERCOT was permitted to maintain  letters of credit to satisfy TCE's post-petition obligations.

In December 2003, the bankruptcy court approved TCE's reorganization plan (the "TCE Plan").   The TCE Plan took into account a $14.8 million unsecured obligation owed to ERCOT (the "Plan Debt") largely based on the unpaid invoices.  ERCOT's claim, although unsecured, was singled out from other unsecured claims because of its size, complexity,  and a pending lawsuit against ERCOT and its member electricity suppliers.  In addition, the TCE Plan formally incorporated the September Order.  After confirmation, TCE was again obliged to guarantee electricity purchases by posting security with ERCOT pursuant to the assumed QSE Agreement.  Because TCE did not have the resources to post sufficient collateral, May, TCE's principal, provided financing.  On behalf of TCE, May posted a $900,000 standby letter of credit (the "LOC"),

3

No. 08-40890

the subject of this dispute.[2]  May personally purchased the LOC from Wells Fargo Bank through an intermediary, American National Bank.

After confirmation, TCE continued to struggle.  It defaulted on the Plan Debt while remaining current on its post-petition invoices for electricity purchases.  ERCOT decided to use the LOC to satisfy some of the Plan Debt.  It sent a letter to TCE stating that the assumed QSE Agreement gave ERCOT the right to draw down the LOC to satisfy the Plan Debt.  TCE responded that, pursuant to the TCE Plan, ERCOT could only draw down the LOC to satisfy post-confirmation electricity purchases.  Because TCE was current on the post-confirmation invoices, TCE believed that ERCOT could not draw on the LOC.

On March 31, 2005 ERCOT presented the proper documents to Wells Fargo, and Wells Fargo paid ERCOT pursuant to the LOC.  Wells Fargo sought repayment from American National Bank, which then sought repayment from May.  May then commenced this litigation in the bankruptcy court.  To cover his guarantee obligations to American National Bank, May executed a promissory note (the "May Note") and paid interest during the pendency of this litigation.  TCE became a Chapter 7 debtor shortly afterward, and its Trustee was substituted for TCE as an additional plaintiff.

May initially sought an injunction to prevent ERCOT from drawing down the LOC under TEX. BUS. & COM. CODE § 5.109(a).  May asserted that ERCOT

---

[2] A standby letter of credit is like a traditional letter of credit. *Republic National Bank v. Northwest National Bank*, 578 S.W.2d 109, 112-14 (Tex. 1978).  There are three parties to the letter of credit transaction:  the applicant (May), who obtains the credit for a beneficiary (ERCOT) from an issuer (Wells Fargo). *Id.* at 112; TEX. BUS & COM. CODE ANN. § 5.102(a) (Vernon 2002).  The letter of credit contract itself is one of a set of three separate contracts: (1) the underlying contract between the applicant and beneficiary, (2) the contract between the issuer and applicant arranging the credit, and (3) the executory letter of credit contract between the issuer and the beneficiary. *Republic*, 578 S.W.2d at 112.  Each of these contracts is independent; one does not affect the other.  The contractual disputes between the applicant and the beneficiary do not affect the contracts between applicant and issuer or beneficiary and issuer. *Id.* at 114.

No. 08-40890

was committing a material fraud against him.[3]  ERCOT had already drawn down the LOC, however, so the adversary proceeding was modified to determine, *inter alia*, whether ERCOT was entitled to retain the $900,000.[4]  May argued

---

[3] Throughout this litigation, May has contended that the LOC only secured TCE's post-petition electricity invoices to ERCOT under the TCE Plan.  This is incorrect; by its own language the LOC secured all of TCE's obligations to ERCOT.  A letter of credit is a completely independent contract from an underlying contract.  *GATX Leasing Corp. v. DBM Drilling Corp.*, 657 S.W.2d 178, 181 (Tex. App.– San Antonio 1983, no writ) ("[I]t is a cardinal principle of letter of credit law that the obligation of the issuer bank to pay to the beneficiary upon presentment of conforming documents, is independent of the underlying contractual relationship between the customer and the beneficiary.").  A letter of credit is properly payable upon presentation of specific documents so long as those specific documents precisely conform to conditions established in the contract between applicant and issuer.  TEX. BUS. & COM. CODE ANN. § 5.108 (Vernon 2002) ("an issuer shall honor a presentation that, as determined by the standard practice referred to in Subsection (e), appears on its face strictly to comply with the terms and conditions of the letter of credit").  The issuer must only deal in documents, the intentions of the applicant and beneficiary are irrelevant.  *GATX Leasing Corp.*, 657 S.W.2d at 181.

The LOC places no restrictions on which debt allowed ERCOT to draw down on the letter of credit.  Indeed, the document only requires that ERCOT warrant: "We hereby certify to you that $_____ is due to us by the QSE Applicant."  Upon presentation of the document, the LOC imposes no other restrictions:

> Payment hereunder shall be made regardless of:  (a) any written or oral direction, request, notice or other communication now or hereafter received by [Wells Fargo] from the QSE Applicant or any other person except [ERCOT], including without limitation any communication regarding fraud, forgery, lack of authority or other defect not apparent on the face of the documents presented by [ERCOT], but excluding solely an effective written order issued otherwise than at our instance by a court of competent jurisdiction which order is legally binding on us and specifically orders [Wells Fargo] not to make such payment.
>
> . . . .
>
> [ERCOT] shall not be bound by any written or oral agreement of any type between [Wells Fargo] and the QSE Applicant or any other person relating to this credit, whether now or hereafter existing. . . .

As TCE owed the Plan Debt to ERCOT, ERCOT faithfully complied with the terms of the letter of credit and properly warranted that TCE did owe $900,000 to ERCOT.  ERCOT's document is neither forged, nor fraudulent and would not facilitate a material fraud against TCE.  TEX. BUS. & COM. CODE ANN. § 5.109(a) (Vernon 2002).  If TCE/May intended to restrict ERCOT's LOC to specific debts, they should have written the documents more carefully.

[4] The bankruptcy and district courts did not clearly identify May's cause of action.  May originally sued ERCOT for a breach of warranty under TEX. BUS. & COM. CODE ANN. § 5.110(a)(2).  Under § 5.110(a)(2), upon presentment, the beneficiary (ERCOT) warrants to

5

No. 08-40890

that ERCOT violated the LOC's underlying contract (the QSE Agreement), the TCE Plan, and the September Order. He asserted that the QSE Agreement and TCE Plan allowed ERCOT to draw down the LOC only to satisfy post-confirmation electricity purchases, not the Plan Debt. In its first ruling, the bankruptcy court held that ERCOT breached the standby LOC agreement, interpreted in light of the TCE Plan. The court awarded May $900,000 in contract damages, but did not award attorneys fees.

Both parties appealed to the district court. The district court essentially affirmed the $900,000 judgment but for its decisional basis relied on ERCOT's violation of the September Order.[5] The court remanded to evaluate additional issues, including the Trustee's claim.

On remand, the bankruptcy court reaffirmed its judgment based on the injunction-violation theory and awarded May contract damages of $900,000 to satisfy the May Note; $169,422.20 in interest paid during litigation; and

---

the applicant (May) that "the drawing does not violate any agreement between the applicant and beneficiary or *any other agreement intended by them to be augmented by the letter of credit.*" (emphasis added). This warranty is not often used because the applicant sues the beneficiary directly for breach of the underlying contract. However, the drafters of the Uniform Commercial Code understood that with many standby letters of credit, and as is the case here, there might not be an underlying contract between the applicant and beneficiary. To address this circumstance, § 5.110(a)(2) gives the applicant an additional cause of action against the beneficiary. TEX. BUS. & COM. CODE ANN. § 5.110(a)(2) cmt. 2 (Vernon 2002) ("This warranty has primary application in standby letters of credit or other circumstances where the applicant is not a party to an underlying contract with the beneficiary.").

In the present case, ERCOT and May intended the LOC to augment the assumed QSE Agreement. Consequently, ERCOT implicitly warranted that it did not violate the QSE Agreement when drawing down the LOC. In his pleadings, May effectively claimed that ERCOT breached this warranty.

[5] Thus, the cause of action on which May succeeded changed from a breach of warranty claim under § 5.110(a)(2) into a claim of civil contempt for breaching a court order. *See In re National Gypsym Co.*, 118 F.3d 1056, 1063 (5th Cir. 1997). Both of these claims arise out of the interpretation of the TCE Plan and September Order, neither prevails unless May's interpretation is correct. Because we disagree with May's interpretation, we need not and do not opine on other elements of these claims.

No. 08-40890

prejudgment interest on the total award in the sum of $178,256.53. In addition, it held ERCOT in contempt for violating a court order (the TCE Plan) and awarded May attorneys fees. The district court reaffirmed the judgment. ERCOT now appeals to this court.

## II. JURISDICTION

Before discussing the merits of this case, this court must first address the issue of subject matter jurisdiction. Subject matter jurisdiction is reviewed *de novo*. *Gasch v. Hartford Accident & Indem. Co.*, 491 F.3d 278, 281 (5th Cir. 2007). Bankruptcy jurisdiction, like all federal jurisdiction, must be based on a statute. *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999). In the face of ERCOT's challenge, May raises various theories of jurisdiction. We need not address them all. As pled by May, the original petition sought in part an interpretation of the TCE reorganization Plan's terms. TCE joined the suit to pursue its own claims against ERCOT arising from TCE's construction of the Plan. Although an argument may be spun against bankruptcy court jurisdiction, this dispute was intimately tied to the terms of the TCE Plan and the court's September Order, and in particular, the extent to which the injunctive provision of that order limits ERCOT's post-confirmation conduct. Consequently, the bankruptcy court had jurisdiction over the dispute. *See In re U.S. Brass Corp.*, 301 F.3d 296, 304-05 (5th Cir. 2002) (citing *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390-91 (5th Cir. 2001)).

## III. DISCUSSION

On appeal, this court reviews the bankruptcy court's judgment by the same standards that guided the district court scrutinizing the same judgment in its appellate capacity. *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001). Findings of fact are reviewed for clear error and conclusions of law are reviewed de novo. *Id.*

No. 08-40890

The parties agree that if ERCOT violated the September Order, then May is entitled to judgment. They part company over the extent to which the September Order, after its incorporation in the TCE Plan, constrained ERCOT's freedom to draw on the LOC to satisfy the Plan Debt. Resolving the issues requires interpretation of the September Order and the TCE Plan according to general rules of contract interpretation. *In re Stratford of Texas, Inc.*, 635 F.2d 365, 368 (5th Cir. 1981). A bankruptcy plan, this court has said, represents a kind of consent decree that should be interpreted as a contract. *Id*. The language of these documents taken as a whole, if unambiguous, is the controlling expression of the parties' intentions. *Kimbell Foods, Inc. v. Republic Nat. Bank Dallas*, 557 F.2d 491, 496 (5th Cir. 1977).

The September Order, incorporated into the TCE Plan, states:

ORDERED that Debtor is hereby authorized to assume the pre-petition Qualified Scheduling Entity Agreement with ERCOT, modified as follows:

1. Defendant ERCOT is prohibited from directly or indirectly (i) taking any further action to collect the Invoices that are the subject of the Adversary Complaint, **(ii) drawing down any Letter of Credit ["LOC"] securing the obligation represented by those Invoices, (iii) otherwise taking any action to facilitate the collection or payment of those Invoices and/or the obligation reflected therein,** or (iv) the foreclosure of any collateral securing payment of those Invoices or the obligation reflected by them except as authorized by further order of this court.

(emphasis added). TCE's Plan incorporated the September Order as follows:

The *Order Authorizing Debtor to Assume Modified Executory Contract with Electric Reliability Council of Texas, Inc.* ("Order") signed by the Court on September 4, 2003 is incorporated into the Plan and is to remain in full force and effect, except the payment terms set out herein to be made on the ERCOT Claim shall supercede the payment terms regarding all payments to ERCOT under the Order which were to begin on July 30, 2004.

8

ERCOT drew down the LOC to partially satisfy TCE's default in payments on the Plan Debt. May challenges ERCOT's action in several ways. May contends that the express terms of the September Order were carried into the Plan and prevented ERCOT from drawing down the LOC for anything other than post-confirmation electricity purchases. May asserts that to hold otherwise renders the September Order superfluous and conflicts with provisions of the TCE Plan that provided a different, exclusive means for satisfying the Plan Debt. May relies on parol evidence, admitted by the bankruptcy court, to explain the parties' intentions. Finally, May contends that ERCOT's draw on the LOC afforded it a disproportionate recovery in comparison to other unsecured TCE creditors. We consider each argument in turn.

**A.**

May's first contention is that the Plan Debt owed to ERCOT upon confirmation constituted "Invoice[s]" or an "obligation represented by those Invoices" subject to the September Order. The bankruptcy and district courts agreed with this characterization, but we do not.

Fundamental to Chapter 11 reorganization is that unless a plan provides otherwise, the debtor's pre-petition obligations are replaced and superseded by the restructured debt arrived at in a plan. *See* 11 U.S.C. § 1141(d)(1). Discharge does not eliminate pre-petition debt, but it effects an injunction against creditors' enforcement of their pre-petition rights against the debtor. Thus "[o]nce the reorganization plan is approved by the bankruptcy court, each claimant gets a 'new' claim, based upon whatever treatment is accorded to it in the plan itself." *In re Benjamin Coal Co.*, 978 F.2d 823, 827 (3d Cir. 1992).

The TCE Plan follows the usual model. Nowhere is ERCOT's pre-petition invoice debt excluded from discharge. On the contrary, Section 17 of the Plan uses blanket language discharging all pre-petition debts:

No. 08-40890

IT IS THE INTENTION OF THIS PLAN THAT ONCE
CONFIRMATION OCCURS, THE DEBTOR WILL BE FULLY,
FINALLY, AND COMPLETELY DISCHARGED FROM ALL
PRE-CONFIRMATION LIABILITIES INCLUDING CLAIMS AND
DEBTS AND SHALL BE REVESTED WITH ALL PROPERTY OF
THE ESTATE AS HEREIN PROVIDED.

In the same section, the Plan states that "ERCOT will not be allowed to assess Estimated Aggregate Liability calculations based on TCE's *discharged* pre-petition debt." (emphasis added).[6] As ERCOT points out, the TCE Plan states nineteen times that pre-petition debts owed by TCE were discharged and extinguished upon confirmation. Cumulatively, these sections leave no doubt that all pre-petition obligations including ERCOT's  invoice debt were replaced with new contractual obligations through the Plan.  Moreover, the TCE Plan modifies ERCOT's pre-petition invoice claims, explaining in Section 4 how the "ERCOT Claim" (the pre-petition invoice debt) is to be restructured and satisfied, *inter alia*, by a series of quarterly payments.  If the pre-petition invoice claims were not discharged, this section would be unnecessary.  By changing the payment terms and amount of ERCOT's pre-petition invoice debt, TEC assumed a new debt in accordance with the TCE Plan.  Because the Plan Debt owed to ERCOT is neither an "Invoice" nor an "obligation represented by those Invoices," the September Order's injunction does not govern ERCOT's action regarding the Plan Debt.

**B.**

Appellee contends that interpreting the September Order in this plain language manner renders it superfluous: if the September Order did not cover the Plan Debt, it did not cover anything.  Yet a key tenet of contract construction

---

[6] Because QSE Applicants purchased electricity daily but did not pay daily, they had outstanding balances with ERCOT.  ERCOT predicted the size of these outstanding balances (termed "Estimated Aggregate Liability") for each applicant and required the applicant to post security to cover a percentage of that amount.  The TCE Plan forbade ERCOT from including the pre-petition invoice debt or Plan Debt in TCE's Estimated Aggregate Liability.

is that each clause should be interpreted to give it effective meaning. *Reliant Energy Services, Inc. v. Enron Canada Corp.*, 349 F.3d 816, 822 (5th Cir. 2003). To give the September Order effective meaning, the court must interpret it to cover the Plan Debt.

This argument is unpersuasive on two levels. First, the September Order still had effect as applied to the actual pre-petition invoices. It prevented ERCOT from collecting the pre-petition invoices from any third parties that guaranteed the debt. 11 U.S.C. § 524(e) ("discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."). Similarly, the September Order prevented ERCOT from drawing on any remaining letters of credit that secured the pre-petition invoice debt. Second, from a larger perspective, the purpose of the September Order was to craft TCE's assumption of its QSE contract with ERCOT, which allowed it to continue in business. Under the Bankruptcy Code, a debtor normally has to "cure" all defaults before it may assume a pre-petition executory contract. 11 U.S.C. § 365(b)(1)(A). The September Order was a compromise that allowed TCE to assume the QSE Agreement without curing the default (the pre-petition invoices). The TCE Plan continued the September Order in effect principally to preserve the compromise and achieve continuity in the assumed QSE. This objective was by no means rendered superfluous.

## C.

May further argues that the September Order's prohibitions should cover the Plan Debt because the TCE Plan authorized an exclusive method by which ERCOT would receive payments on its Plan Debt. ERCOT was to be paid periodically from post-confirmation revenues and, failing that, could look only to its pro rata share of a $1.3 million letter of credit to secure the Plan Debt. May asserts that the (measly) $1.3 million letter of credit was the sole and

exclusive collateral if TCE defaulted on the Plan Debt and that the only other potential remedy was converting the case to Chapter 7.

This is not what the TCE Plan says. The Plan does not state that the $1.3 million letter of credit must remain the sole and exclusive security for the ERCOT Claim. Businesses regularly add security to previously unsecured debts. That the unsecured creditors received a single, disproportionately small letter of credit pursuant to the Plan does not preclude TCE from providing other sources of collateral going forward. The TCE Plan cannot be interpreted as making the $1.3 million letter of credit the exclusive collateral for the Plan Debt; still less could the Plan constrain ERCOT from receiving an LOC put up by May rather than TCE. Thus, our literal interpretation of the September Order is not inconsistent with this provision.

May also contends that because the TCE Plan restricted ERCOT's ability to calculate "Estimated Aggregate Liability" ("EAL"), ERCOT cannot draw down the $900,000 LOC to satisfy the Plan Debt. As has been noted, the EAL calculations determined how much collateral TCE was required to post with ERCOT to purchase electricity. The TCE Plan states that:

> ERCOT will not be allowed to assess Estimated Aggregate Liability calculations based on TCE's discharged pre-petition debt. Upon Confirmation, TCE's EAL calculations will be based solely upon post-petition obligations only.

The limited EAL calculation is not relevant to whether ERCOT could draw down the $900,000 LOC to satisfy the Plan Debt. If anything, it emphasizes that TCE knew how to insist on explicit limitations of ERCOT's rights. This clause effectively reduced TCE's requisite collateral. An EAL calculation including the Plan Debt would have required TCE to post significantly more collateral with ERCOT, but it does not affect the nature of the collateral actually posted. The EAL calculations do not control what ERCOT may *do* with posted collateral, only

*how much* collateral TCE must post. Accordingly, a literal interpretation of the September Order is not inconsistent with this provision.

## D.

May next asks the court to look beyond the plain meaning of the September Order and TCE Plan to parol evidence and evidence of ERCOT's post-confirmation actions. May proffers several pieces of evidence implying that the parties intended the September Order's prohibitions to cover Plan Debt and correspondingly limited the $900,000 LOC.

There is no reason to consider such evidence. If possible, the court is "required to analyze a contract's meaning by its language without resort to extrinsic considerations. This is because the language of an agreement, unless ambiguous, represents the parties' intention." *Kimbell*, 557 F.2d at 496. If TCE and May intended to limit ERCOT's ability to draw down the LOC to post-petition electricity claims, they had ample opportunity to insert such language into the TCE Plan or the LOC itself. The plain language of the September Order and TCE Plan is sufficiently clear and unambiguous to resolve this dispute.

## E.

Finally, May asserts that ERCOT recovered more than TCE's other unsecured creditors by drawing down the LOC. Even if this is true, the point lacks legal significance. Under the Bankruptcy Code, unsecured creditors share equally from the *estate's* assets. Unsecured creditors may recover unequal amounts from third parties depending on their specific legal rights. Here, ERCOT's unsecured claim was treated differently in the TCE Plan because of its different legal relationship with TCE, and it has received an additional recovery from *May's* assets because May posted the LOC. Neither of these circumstances violates the TCE Plan.

No. 08-40890

## IV.  CONCLUSION

The Plan Debt was post-petition bankruptcy debt, not pre-petition invoice debt.  Accordingly, the September Order and TCE Plan did not prohibit ERCOT from drawing down the $900,000 letter of credit to satisfy the Plan Debt. Because the judgment was incorrectly premised on ERCOT's having violated a court order or the LOC, the judgment is **REVERSED and RENDERED.**