# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-40751

United States Court of Appeals
Fifth Circuit

**FILED**

August 15, 2014

Lyle W. Cayce
Clerk

In the matter of: EDWARD MANDEL,

Debtor,

--------------------------------------------------------

EDWARD MANDEL,

Appellant, Cross–Appellee,

v.

STEVEN THRASHER; JASON COLEMAN,

Appellees, Cross–Appellants.

Appeals from the United States District Court
for the Eastern District of Texas
USDC No. 4:11-CV-774

Before BARKSDALE, CLEMENT, and OWEN, Circuit Judges.

PER CURIAM:*

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-40751

The bankruptcy court entered judgment in favor of Stephen Thrasher and Jason Coleman on state-law claims, including the misappropriation of trade secrets, against Debtor Edward Mandel. The district court affirmed the decision in its entirety. All parties appeal and sixteen issues have been presented in this court. We affirm the judgment in part but vacate the award of damages and remand to the bankruptcy court for further proceedings.

## I

This lawsuit arose out of the failure of White Nile, a joint-venture between Mandel and Thrasher. Thrasher, an intellectual property attorney, conceived of an idea for a new type of search engine. He shared that idea with Mandel, who represented that he had expertise with the databases that would store the index for the search engine. They signed non-disclosure agreements. Thrasher submitted a provisional patent application, entitled "System, Methods, and Devices for Searching Data Storage Systems and Devices," to the United States Patent and Trademark Office (USPTO). Thrasher was the sole inventor listed on the application.

Mandel and Thrasher formed White Nile to develop this invention. Mandel agreed to finance a prototype, which they anticipated would cost approximately $300,000. Thrasher signed a consulting agreement with White Nile that named Thrasher as a co-founder, an inventor, and chief executive officer. Shortly thereafter, Thrasher filed a second provisional patent application, "System, Methods, and Devices for Searching Data Storage Systems and Devices." Thrasher again was shown as the sole inventor.

Mandel and Thrasher then met with representatives of Meaningful Data Solutions (MDS), who agreed to develop the software for the search engine. MDS forecast a cost of $216,500, and Mandel represented that he would pay MDS. Thrasher assigned to White Nile his search engine intellectual property. The document provided:

2

[S]hould White Nile Software, Inc. fail to timely prosecute any such invention by failing to timely file appropriate responses to government entities, including the USPTO statutorily shortened response periods, all rights in the inventions or creations transferred to White Nile Software, Inc. are then void, and any rights remaining transfer back to [Thrasher], and [Thrasher] may prosecute the applications [and] other documentation needed, and this agreement shall have no effect as to those items.

Thrasher and Mandel then signed a document titled, "Unanimous Consent in Lieu of Organizational Meeting of Directors of White Nile Software, Inc." It named Mandel as president/treasurer of White Nile and Thrasher as chief executive/secretary. It granted both men 26 million shares of White Nile stock in exchange for the following consideration: (1) Thrasher agreed to assign his then-existing provisional patent applications as well as any future intellectual property to White Nile and (2) Mandel agreed, among other things, to develop White Nile's search engine at his expense by December 31, 2005.

White Nile retained Paul Williams as the Chief Financial Officer. His role was to develop a business plan and raise capital. Mandel and Williams led Thrasher to believe that Williams was a licensed broker-dealer. This was untrue.

White Nile also retained Jason Coleman to develop a graphic representation of the search engine. Coleman signed a consulting agreement, which provided that he was to be "chief creative officer" and a co-founder. Coleman was to produce a demonstrative version of Thrasher's idea, to be called SAQQARA, for which he was to receive an annual salary of $133,000 and an equity interest in the venture if he completed the prototype on schedule. Coleman assigned his work product, including patentable ideas, to White Nile as part of this agreement.

Mandel assured Coleman that White Nile had detailed financial projections, that he intended to pay MDS to create system documents, and

later, when MDS's participation did not materialize, that he would contribute the funds that were to have been paid to MDS directly into White Nile. Thrasher subsequently submitted a third provisional patent application to the USPTO titled "Real-Time Search Visualization." It listed both Thrasher and Coleman as inventors. Despite completing his work, Coleman never received an equity interest in White Nile.

Instead of proceeding with the plan to hire MDS to develop the search engine, Mandel suggested that an acquaintance of his, Eduardo Carrascoso, could perform the same work at a lower cost in the Philippines. Mandel represented that Carrascoso had agreed to invest in White Nile, and that Carrascoso had hired a team of PhDs to develop a prototype search engine. Mandel represented that Carrascoso had placed $1 million in escrow to invest in White Nile. Thrasher included these representations in a written presentation, reviewed by Mandel, to potential investors. Mandel had previously visited the Philippines and represented that he had met the developers working for White Nile.

White Nile persuaded Rod Martin to become a member of the board of directors and hired Skinner Layne as an employee. Skinner thought that his parents, Eddie and Ellen Layne, should invest in White Nile. The bankruptcy court found that Martin "cautioned the Laynes about the risks of investing in a start-up company." Nevertheless, the Laynes invested $300,000 in exchange for 75,000 shares of stock.

Thrasher, Mandel, and Coleman thereafter traveled to the Philippines. Thrasher and Coleman discovered that no one had been working on the search engine and that Carrascoso had not, in fact, escrowed $1 million to invest in White Nile. Carrascoso not only had not invested any money in White Nile, he did not plan to do so, and he had not hired any developers. Just the opposite, Carrascoso expressed interest in being *paid* in excess of $1 million in return

for providing services to White Nile.  Thrasher eventually reached a tentative, oral agreement with Carrascoso to provide development services. Thrasher, Mandel, and Coleman interviewed applicants to begin work on the project in Manila.  During the interviews, Thrasher and Coleman learned that "Mandel was not particularly knowledgeable about . . . database programming," despite his earlier representations.  The three of them also discussed new names for White Nile, including "Nexplore," but did not reach an agreement.  After they returned to the United States, Carrascoso declined to proceed with providing services to White Nile.

On December 15, 2005, Williams conducted an investor meeting in Arkansas using the demonstrative materials developed by Coleman.  The next day, Thrasher discovered that Williams was not a licensed broker.  As the bankruptcy court found, "Thrasher was well aware of the legal repercussions of a misrepresentation about Williams' status to potential investors and took immediate action to address what he viewed as a disaster."

By mid-December 2005 Mandel and Thrasher's relationship was disintegrating.  There was no development team functioning in the Philippines.  It had also become evident that Mandel did not intend to contribute any of his own funds to White Nile despite his previous representations.  Instead, Mandel and Skinner formed a new company. On December 18, Skinner reserved NeXplore.com as a domain name.  Mandel sent Joseph Savard, the chief technology officer that Mandel had hired for White Nile, to Thrasher's home to review White Nile's patents and projects.  Mandel then hired Savard at NeXplore.  Mandel also recruited Williams to join NeXplore.  At about this time, Thrasher instructed White Nile's bank to make a payment to Thrasher's father as reimbursement for hardware purchased for White Nile.  These instructions conflicted with instructions Mandel had already given the bank, unbeknownst to Thrasher, to place all the funds in

5

White Nile's account into a new account under Mandel's sole control. Thrasher and Martin met with Mandel to discuss the situation. Mandel did not tell them that he was forming a new company, NeXplore, or that Mandel had asked the Laynes to move their invested funds from White Nile to NeXplore. Thrasher and Martin discovered much later that NeXplore received $197,000 from the Laynes and $286,500 from Arkansas Investment, a limited liability company formed by the Laynes after the December 15 White Nile presentation.

On January 11, 2006, Mandel signed corporate documentation purporting to remove Thrasher from office and purporting to appoint Skinner and Williams to serve as new directors of White Nile. On January 16, 2006, Mandel, Williams, and Skinner held a directors' meeting without informing either Thrasher or Martin. At the meeting, they purported to declare that White Nile was no longer a going concern, and also purported to release all individuals from the non-compete and non-disclosure agreements they had signed with White Nile. The next day, Skinner incorporated NeXplore. Skinner, Mandel, and Williams all became shareholders and directors and the Laynes became investors. Williams drafted a business plan "virtually identical" to the one he created for White Nile. Savard testified that Mandel referred to NeXplore as "just a name change" from White Nile and that Mandel told him to hide from Thrasher that NeXplore was building a search engine.

Thrasher filed two non-provisional (or utility) patents relating to White Nile's search engine during 2006. Prior to that time, Mandel, the acting CEO of White Nile, had taken no action to protect White Nile's intellectual property from NeXplore or other possible encroachers. The first patent application (299 patent), listing Thrasher as the sole inventor, was filed on June 30, 2006 and issued on September 14, 2010. The second (802 patent), listing both Thrasher and Coleman as inventors, was filed on December 14, 2006. Shortly after the filing of the 299 utility patent, Williams filed a grievance against Thrasher

with the Texas State Bar. Skinner testified that this was an attempt by Mandel "to cow" Thrasher by threatening his livelihood. The Bankruptcy Court found that "Mandel's testimony that he did not participate in filing the grievance, or that he did not intend to threaten Thrasher's livelihood, was contradicted by the documentary evidence." The Texas Bar dismissed the grievance.

In early 2006, Coleman approached Mandel and Thrasher to seek payment for his work for White Nile. Thrasher agreed to pay Coleman but Mandel declined and instead sued Coleman in state court on behalf of White Nile. Mandel later sued Thrasher as well. Coleman and Thrasher responded by asserting counter-claims against Mandel and brought claims against others. The parties reached a tentative settlement in which Thrasher and Coleman were to receive payments of $450,000 and a royalty fee of two percent of NeXplore's gross revenue for five years in return for agreeing to license their patents to NeXplore. After the settlement had been announced in open court, Mandel refused to proceed with it. The state court appointed a receiver for White Nile, but Mandel refused to pay his portion of the receiver's fees. Mandel filed a grievance against Thrasher with the USPTO contending that he was the one who actually invented the intellectual property. The USPTO dismissed his complaint. The bankruptcy court found that "Mandel was not, in fact, an inventor or co-inventor of any of the intellectual property at issue."

On January 25, 2010, Mandel filed a Chapter 11 petition. The state court was proceeding to sanction Mandel for his failure to pay the receiver's fees when he filed for bankruptcy. Since 2006, NeXplore had paid Mandel a total of $2,726,926 in salary and incurred approximately $750,000 in legal fees on his behalf. Thrasher and Coleman, on their own behalf and derivatively on behalf of White Nile, asserted numerous state law claims in the bankruptcy court. Mandel counterclaimed against Thrasher and Coleman. The

No. 13-40751

bankruptcy court conducted a bench trial and found Mandel liable for (1) theft or misappropriation of trade secrets; (2) breach of contract; (3) breach of fiduciary duty; (4) fraud and fraudulent inducement; (5) oppression of shareholder rights; and (6) conspiracy. The bankruptcy court awarded: $400,000 in damages to Coleman; $1,000,000 to Thrasher; and $300,000 to White Nile. The Court denied the request for exemplary damages. It awarded attorneys' fees to Thrasher and Coleman because they prevailed on their theft of a trade secret claim. The parties appealed and cross-appealed to the district court, which affirmed the judgment in its entirety. The parties now appeal and cross-appeal to this court. We affirm the judgment of the district court in part and vacate in part. We vacate only the damages award by the bankruptcy court, and we remand the issue of damages to the bankruptcy court so that it may explain, support, or revise its compensatory damages award in order to be consistent with state and federal precedents.

## II

This court reviews the decision of a district court, sitting in an appellate capacity, by applying the same standards employed by the district court in its review of the bankruptcy court's findings of fact and conclusions of law.[1] We review findings of fact, including a damages award, for clear error, and we review conclusions of law de novo.[2] Under the clearly erroneous standard, we will "defer to a bankruptcy court's factual findings unless, after reviewing all of the evidence, we are left with a firm and definite conviction that the bankruptcy court made a mistake."[3]

---

[1] *In re Tex. Commercial Energy*, 607 F.3d 153, 158 (5th Cir. 2010).

[2] *Id.*; *see also Delahoussaye v. Performance Energy Servs., L.L.C.*, 734 F.3d 389, 394 (5th Cir. 2013) ("A district court's award of damages is a finding of fact, which we will reverse only for clear error.").

[3] *In re Cahill*, 428 F.3d 536, 542 (5th Cir. 2005) (internal quotation marks omitted).

No. 13-40751

Mandel raises a number of errors on appeal. He contends no damages should have been awarded, there was no breach of contract as to Coleman, the misappropriation or theft of trade secrets causes of action cannot be sustained, there is no evidence of fraud, the finding of shareholder oppression in favor of Thrasher cannot stand, Mandel did not breach a fiduciary duty to White Nile, and there is no basis for the finding of conspiracy.

Thrasher and Coleman challenge the award of damages, claiming that the award should have been greater.  They also challenge the exclusion of certain evidence by the bankruptcy court and the denial of punitive damages.

**III**

Mandel asserts that the bankruptcy court erred by finding that he misappropriated trade secrets. Misappropriation is established by showing that (a) a trade secret existed, (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (c) there was use of the trade secret without authorization.[4]  Mandel alleges that the third element, use, was not established.  The term "use" is defined broadly under Texas law.

> [A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a use . . . . Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development,

---

[4] *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013); *see also Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied).

No. 13-40751

or soliciting customers through the use of information that is a trade secret all constitute use.[5]

Our review of the record reflects that there were sufficient facts to support a finding of actual use.

Mandel formed NeXplore in order to develop a search engine technology that experts testified was very similar to the technology developed and patented by White Nile.  The bankruptcy court found these experts to be credible.  Additionally, NeXplore hired a number of former employees of White Nile and developed an almost identical business plan.  Mandel joked that the only difference between the two companies was the name.  Mandel ensured that he and NeXplore's employees retained access to White Nile's intellectual property by purporting to vote Thrasher and Coleman out of White Nile's management and by sending NeXplore employees to inspect Thrasher and Coleman's patent applications and SAQQARA documents. As an example, Mandel instructed Savard to discuss the White Nile patents, specifications, and algorithms with Thrasher and Coleman before hiring him at NeXplore.

Mandel argues that Coleman testified that there were no other search engines on the market with the functionality envisioned by Thrasher and Coleman.  Mandel alleges that Coleman, in referring to other search engines on the market, "was of necessity including NeXplore," which implies that NeXplore was not using White Nile's technology.  But Coleman compared the NeXplore patent application to the White Nile patents and determined that there was "substantial duplication."   Further, NeXplore's product had not launched at the time that Coleman testified.

The weight of expert testimony supported the conclusion that White Nile's and NeXplore's concepts were very similar.  The bankruptcy court could

---

[5] *Wellogix, Inc.*, 716 F.3d at 877 (internal quotation marks and citations omitted).

properly and reasonably conclude that actual use was demonstrated. At the very least it appears that NeXplore "rel[ied] on the trade secret to assist or accelerate research or development."[6] Even if these facts were insufficient to support a finding of actual use, they support a reasonable inference of actual use.[7] NeXplore was formed by the same individuals, to create a substantially similar product, with funding from the same investors, based on intellectual property that those individuals had not invented and did not own. We affirm the bankruptcy court's ruling on this claim.

Mandel contests his liability under the Texas Theft Liability Act (TTLA). The TTLA imposes civil liability for "unlawfully appropriating property" as defined by Texas Penal Code § 31.05.[8] Under § 31.05, a person commits theft of trade secrets if, without the trade secret owner's consent, he knowingly (1) steals a trade secret, (2) makes a copy of an article representing a trade secret, or (3) communicates or transmits a trade secret.[9] Mandel asserts that he did not commit theft of a trade secret because he lacked the requisite *mens rea*. The bankruptcy court found that "Mandel specifically intended to take control of White Nile's intellectual property and use it to start up his own business" and that Mandel and his co-conspirators were "fully aware of exactly what they were doing." These conclusions are not clearly erroneous based on the record.

---

[6] *Id.*

[7] *See Global Water Grp., Inc. v. Atchley*, 244 S.W.3d 924, 930 (Tex. App.—Dallas 2008, pet. denied) ("Evidence of a similar product may give rise to an inference of actual use under certain circumstances.").

[8] TEX. CIV. PRAC. & REM. CODE § 134.001-004. The civil remedy provided for by the TTLA for misappropriation of trade secrets was superceded by the Texas Uniform Trade Secrets Act (TUTSA), which took effect September 1, 2013. *Id.* § 134A.001-008. The TUTSA has no effect on the present litigation because the act only applies "to the misappropriation of a trade secret made on or after [September 1, 2013]." Uniform Trade Secrets Act, 83rd Leg., R.S., ch. 10, § 3, 2013 Tex. Gen. Laws 12, 14.

[9] TEX. PENAL CODE § 31.05.

Rather, the facts present a premeditated, calculated plan to siphon the intellectual property of White Nile for the benefit of NeXplore. Mandel counters that, as an officer of White Nile, he had the ability to give "effective consent" to the theft of the trade secret and thus he cannot be held liable. But this argument is unconvincing. A single officer and shareholder cannot give "effective consent" to breaching his own fiduciary duty to the company by stealing that company's trade secrets. Mandel was not "legally authorized" to consent to this own theft.[10] We affirm the bankruptcy court's ruling on this claim.

## IV

Mandel raises issues that relate to Coleman but not to Thrasher or White Nile. In particular, he contends that the court erred in (1) finding that Mandel breached a contract with Coleman, (2) finding that he had misappropriated Coleman's trade secrets, (3) awarding Coleman attorneys' fees, and (4) holding that he fraudulently induced Coleman.

The bankruptcy court concluded that Coleman could not prevail on a breach of contract claim because he was not a third-party beneficiary of Mandel's non-disclosure agreement. The court's September 30, 2011 order reflects this conclusion, but the court's initial opinion suggests that Coleman prevailed on his breach of contract claim. The district court held that the bankruptcy court's conclusion of law with respect to breach of contract appeared to be a typographical error and was harmless. Mandel argues that awarding attorneys' fees based on breach of contract was error. However, the attorneys' fees awarded by the bankruptcy court were based on the theft of trade secrets claim, not the breach of contract claim. The bankruptcy court said

---

[10] TEX. PENAL CODE § 31.01(3) (defining "Effective Consent" as "consent by a person legally authorized to act for the owner").

the fees were "duplicative" of the fees based on breach of contract. Any errant statement that Coleman proved breach of contract was harmless.

Mandel asserts that Coleman's misappropriation claim fails because Coleman assigned his intellectual property to White Nile. The courts below held that White Nile breached its contract with Coleman by failing to pay his salary and thus the assignment failed for lack of consideration. But Mandel is correct in asserting that a failure of a party to perform the contract does not void the obligations under that contract. As a bilateral contract, the consideration was the promise of performance not the actual performance.[11] However, this does not dispose of the issue because we may affirm a judgment upon any basis supported by the record.[12] The courts below also held that Mandel was liable to Coleman for fraud in the inducement and "a fraudulently induced contract is void."[13]

Mandel counters that Coleman's fraudulent inducement claims fail for two reasons: (1) Coleman did not timely file a fraud cause of action and (2) the misrepresentations that form the basis of the fraud claim came after Coleman agreed to the consulting contract. As to the first argument, Mandel claims that Coleman failed to include a fraudulent inducement claim in the joint pre-trial order and thus could not recover on that theory. Although Coleman may not have delineated his fraudulent inducement allegations as a specific count, he did include factual allegations of misrepresentations that Mandel made to

---

[11] *E.g.*, *Roark v. Stallworth Oil & Gas Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) ("Consideration is a present exchange bargained for in return for a promise."); *see also Westlake Petrochemicals, L.L.C. v. United Polychem, Inc.*, 688 F.3d 232, 239 (5th Cir. 2012) (stating that consideration requires mutual obligation or promises, not actual performance).

[12] *United States v. Chacon*, 742 F.3d 219, 220 (5th Cir. 2014) ("We may affirm the district court's judgment on any basis supported by the record.").

[13] *Fazio v. Cypress/GR Houston I, L.P.*, 403 S.W.3d 390, 419 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331 (Tex. 2011)).

entice Coleman into becoming a consultant for White Nile under a heading titled, "Representations to Coleman." The pretrial order included assertions that Mandel represented to Coleman that Mandel intended to invest of his own money, that Mandel had hired a local firm to create system documents, and that Mandel had already invested $100,000 of his own money. "[A] pleading, or pretrial order, need not specify in exact detail every possible theory of recovery—it must only give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[14]

Mandel contends that Coleman's failure to include these allegations in the first version of his complaint barred him from subsequently alleging these facts in the pre-trial order. But it is well established that a pre-trial order "supersede[s] all prior pleadings and 'control[s] the subsequent course of the action.'"[15] "Once the pretrial order is entered, it controls the scope and course of the trial."[16] Further, Mandel signed the pre-trial order and did not object to the inclusion of these allegations at the time of the order, and any argument regarding their propriety is waived.

Mandel's final assertions of error on this issue are that five of the six alleged misrepresentations occurred after Coleman signed his consulting agreement and therefore could not serve as the basis for a fraudulent inducement claim. This is incorrect. Coleman testified that at least three of the six alleged misrepresentations found by the bankruptcy court occurred prior to Coleman signing his consulting agreement on October 1, 2005. Coleman testified that he was told that Mandel had made a $100,000

---

[14] *Thrift v. Hubbard*, 44 F.3d 348, 356 (5th Cir. 1995) (internal quotation marks and citation omitted).

[15] *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007) (citing *Syrie v. Knoll Int'l*, 748 F.2d 304, 308 (5th Cir. 1984) (internal quotation marks omitted)).

[16] *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000).

investment by both Mandel and Thrasher in September 2005. Coleman testified that the representation that Mandel had arranged for a $1 million investment for the Manila development team occurred in September 2005. He testified that he was told that White Nile would hire a local firm, to be paid by Mandel in cash, to create system documents for White Nile, also in September 2005. The other three misrepresentations found by the bankruptcy court occurred either before or at the same time that Coleman signed his contract. Coleman testified that he was told that Mandel had prepared pro-forma financial projections for White Nile "in or around the end of September, the beginning of October." He was also incorrectly told that Rod Martin was working full-time for White Nile in September, before he signed the contract. That most of the alleged misrepresentations occurred before Coleman signed his consulting contract is sufficient to uphold the bankruptcy court's finding of fraudulent inducement. To the extent that there is conflicting testimony on some of these statements or that some of these statements may have taken place after October 1, 2005, the bankruptcy court found Coleman's testimony that the events took place before he signed the contract to be credible, and nothing in the record discredits this finding or shows that the bankruptcy court committed clear error in making this finding. Mandel's second ground for reversing the district court fails. We affirm the judgment on these issues as well.

## V

Mandel assigns error regarding various other causes of action alleged by Thrasher and Coleman.

### A. Fraud as to Thrasher and White Nile

Mandel alleges that the bankruptcy court erred in finding fraud as to Thrasher and White Nile. The elements of fraud are: (1) a material misrepresentation was made, (2) it was false, (3) the speaker knew it was false

15

or made it recklessly, (4) the representation was made with the intention that it be acted on by the other party, (5) the party acted in reliance, and (6) the party suffered injury.[17]   The bankruptcy court found three statements by Mandel to be fraudulent:  that Mandel had invested $300,000 in White Nile, an investor had placed $1 million in escrow, and there was a team in the Philippines developing White Nile's intellectual property.

Mandel contends that there was no fraud because there was no evidence that Thrasher and Coleman would have developed the intellectual property absent these statements.  The materiality of this argument is unclear.  To the extent that it pertains to the question of whether there was injury, there was evidence of an injury.   While at NeXplore, Mandel was able to attract investments of more than $18 million to develop the intellectual property that belonged to Thrasher and Coleman.   Thrasher and Coleman's intellectual property clearly had value, and investors were available to fund a venture had Thrasher and Coleman developed the intellectual property absent Mandel. The bankruptcy court found that Thrasher was prevented from attempting to develop this technology because of his reliance on Mandel's misrepresentations.  That finding is supported by the evidence.

*B. Shareholder Oppression*

The bankruptcy court found six acts of shareholder oppression, including that Mandel usurped White Nile's business opportunities, failed to prosecute White Nile's intellectual property, used litigation in an attempt to prevent Thrasher and Coleman from reclaiming their intellectual property, and created NeXplore to develop substantially similar intellectual property. Subsequent to the bankruptcy court's decision the Supreme Court of Texas

---

[17] *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex. 1998).

held that there is no common law cause of action for shareholder oppression, concluding instead that such a claim may only be brought pursuant to Section 11.404 of the Texas Business Organizations Code.[18]   Under the statutory definition of shareholder oppression:

> [A] corporation's directors or managers engage in "oppressive" actions under . . . section 11.404 when they abuse their authority over the corporation with the intent to harm the interests of one or more of the shareholders, in a manner that does not comport with the honest exercise of their business judgment, and by doing so create a serious risk of harm to the corporation.[19]

Even under this new standard we conclude that Thrasher has met his burden to demonstrate shareholder oppression.  Mandel does not challenge any of the findings of fact of the bankruptcy court on this issue.  These findings of fact clearly lay out not only that Mandel abused his authority but that he did so with an intent to harm Thrasher's interests in White Nile.  However, we note that on remand, Thrasher is not entitled to compensatory damages on this claim even though he has prevailed.  The Supreme Court of Texas made clear that Section 11.404 "creates a single cause of action with a single remedy."[20] This remedy is not the award of compensatory damages but the "appointment of a rehabilitative receiver."[21]  Therefore, on remand the district court should not award compensatory damages on the shareholder oppression claim.

*C. Breach of Fiduciary Duty*

The bankruptcy court found seven breaches of the fiduciary duty Mandel owed to White Nile. The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant exists; (2) a breach

---

[18] *Ritchie v. Rupe*, 2014 WL 2788335, at \*6, 22 (Tex. Jun. 20, 2014).

[19] *Id.* at \*9.

[20] *Id.* at \*10.

[21] *Id.*

17

by the defendant of his fiduciary duty; and (3) an injury to the plaintiff or a benefit to the defendant from the breach.[22]  The bankruptcy court found that Mandel failed to prosecute White Nile's patent rights, failed to enforce non-disclosure agreements, released members from nondisclosure agreements, competed with White Nile by forming NeXplore, transferred funds from White Nile to NeXplore, disseminated White Nile's trade secrets, and failed to disclose to other officers and shareholders the formation of NeXplore.  Mandel contends that he could not have breached his fiduciary duty because a resolution of the board of directors released him from his non-disclosure and non-compete agreements.  This analysis elides that this resolution was adopted after Mandel purported to force Thrasher and Martin out of the company and purported to elect two of his allies to the board.  In any event, a board resolution adopted by interested directors does not negate a breach of fiduciary duties.[23]  Mandel has not shown that the bankruptcy court's detailed findings on this issue were incorrect.

*D. Breach of Contract as to White Nile and Thrasher*

Mandel argues that the bankruptcy court wrongly concluded that Mandel breached his non-disclosure agreements with both Thrasher and White Nile.  He cites no authority in this section of his brief. This argument is waived for being insufficiently briefed.[24]

---

[22] *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)).

[23] *See, e.g.*, *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719-20 (5th Cir. 1984); *Clark v. Lomas & Nettleton Fin. Corp.*, 625 F.2d 49, 52-53 (5th Cir. 1980); *see also* TEX. BUS. ORGS. CODE ANN. § 21.418 ("Contracts or Transactions Involving Interested Directors and Officers").

[24] *United States v. Demmitt*, 706 F.3d 665, 670 (5th Cir. 2013) ("As Demmitt has cited no authority in support of her contentions . . . we hold this argument waived."); *N.W. Enters., Inc. v. City of Hous.*, 352 F.3d 162, 183 n.24 (5th Cir. 2003) ("A litigant's failure to provide legal or factual analysis results in waiver."); *see also* FED. R. APP. P. 28(a)(8)(A).

No. 13-40751

*E. Conspiracy*

Mandel contends that "[i]f the Court reverses the conclusions of fraud and of misappropriation and theft of trade secrets in favor of Coleman, then there is no underlying tort [for conspiracy] and the Court should reverse the conclusion of conspiracy." As we do not reverse the conclusions of fraud and misappropriation, we affirm the bankruptcy court's judgment regarding the count of conspiracy.

## VI

The bankruptcy court awarded $1.7 million in actual damages. Mandel asserts that this award should be vacated because there was insufficient, credible evidence presented to support it. Thrasher and Coleman claim that the damages award should be increased significantly because the evidence demonstrates that the actual value of either White Nile or the misappropriated trade secrets was significantly more than $1.7 million. Mandel also challenges the bankruptcy court's award of attorneys' fees to Coleman, and Thrasher and Coleman cross-appeal that the bankruptcy court erred in denying exemplary damages.

*A. Compensatory Damages*

Thrasher and Coleman offered a number of damage theories in the bankruptcy court. First, they advanced a "lost asset" or "lost profit" theory of damages, asserting that they could recover the value of the asset that they lost. An expert testified that the fair market value of White Nile was $56 million based on the sale of other, similarly situated start-up companies. The bankruptcy court rejected this evidence, concluding that the expert's "calculations of market value fail[ed] to adequately account for the extremely high failure rate of companies like White Nile." Thrasher and Coleman also offered evidence of the value of White Nile based on the investments made by the Laynes. Extrapolating from the Laynes' purchase of 75,000 shares in White

Nile for $300,000, White Nile would have a value of $219 million. The bankruptcy court rejected this evidence because the Laynes had, like Thrasher and Coleman, "received false information about [Carrascoso's] investment in White Nile at the investor meeting in Arkansas" prior to their decision to invest.

Thrasher and Coleman introduced evidence of the value of NeXplore as evidence of either the value of the lost asset or the value of a fair licensing price. NeXplore never made a profit but it was trading, at its lowest point, at approximately $0.30 per share on the "Pink Sheets." Using this price as a benchmark, Mandel owned $9.9 million in NeXplore stock. The bankruptcy court concluded that this value was on a "sharply downward trajectory," and that the evidence of the fair market value of NeXplore was "fuzzy." Finally, the bankruptcy court declined to base damages on the extent of the wrongful benefit to Mandel—$2,726,926 in salary from NeXplore and $725,789 in attorneys' fees from NeXplore—because it was "not necessarily an indication of value" for the misappropriated trade secret.

The bankruptcy court rejected each of Thrasher's and Coleman's theories of damages. It nevertheless assessed damages because "Thrasher and Coleman were damaged by the conduct of Mandel" and "should prevail on their claims." The court then awarded $1,000,000 to Thrasher and $400,000 to Coleman, without explaining the theory on which it relied or identifying the evidence that supported these awards.

The district court affirmed the damages in their entirety. The district court first held that "the bankruptcy court did not error [sic] in determining that the damages models advanced by claimants are not helpful in assessing damages under the facts of this case." The district court reasoned that the evidence adduced was not determinative of either the value of the trade secret as a lost asset or the value of the "reasonable royalty" that the owners of the

trade secret would have been due. The district court nevertheless affirmed the award, reasoning that "[t]he nature of Mandel's misappropriation made it virtually impossible to prove the amount of damages with reasonable certainty," but that this uncertainty should not completely prevent recovery. The district court concluded that assessing damages in this type of a case "require[d] a flexible and imaginative approach." Both sides appeal this determination.

> Damages in misappropriation cases can take several forms: the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret, the value that a reasonably prudent investor would have paid for the trade secret; the development costs the defendant avoided incurring through misappropriation; and a reasonable royalty.[25]

Damages need not be proved with great specificity. A flexible approach is applied to the calculation of damages in a misappropriation of trade secrets case.[26] "Where the damages are uncertain . . . we do not feel that the uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown."[27] It is sufficient that the plaintiff demonstrates "the extent of damages as a matter of just and reasonable inference" even if the extent is only an approximation.[28]

---

[25] *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013) (quoting *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012)).

[26] *Id.* ("This variety of approaches demonstrates the flexible approach used to calculate damages for claims of misappropriation of trade secrets." (internal quotation marks omitted)).

[27] *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974). While *University Computing* was a decision under Georgia law the Fifth Circuit has cited it favorably in regard to Texas trade secret law on multiple occasions. *See Wellogix*, 716 F.3d at 879; *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 722 (5th Cir. 2006).

[28] *DSC Commc'ns Corp. v. Next Level Commc'ns*, 107 F.3d 322, 330 (5th Cir. 1997) (internal quotation marks omitted).

No. 13-40751

In the present case the bankruptcy court did not make clear the theory upon which it was relying to award damages nor did it explain the evidence supporting the amount of damages. While it is true that uncertainty should not preclude recovery in a trade secrets misappropriation case,[29] Thrasher and Coleman were required to produce enough credible evidence to show "the extent of the damages as a matter of just and reasonable inference," even if the "result be only approximate."[30] From the bankruptcy court's opinion we do not see an approximation—only numbers chosen by the court.

Thrasher and Coleman contend that our recent decision in *Wellogix, Inc. v. Accenture, L.L.P.*[31] supports awarding damages based on the evidence presented at trial. This is incorrect. In *Wellogix*, we affirmed a jury award of $26.2 million in compensatory damages in a Texas misappropriation of trade secrets case despite the defendant's arguments that the valuation was "too speculative."[32] The amount awarded was the amount that the plaintiff's damages expert had testified the company was worth, after deducting the cost of licensing fees.[33] Unlike the present case, the trier of fact calculated the damages award by crediting the evidence presented at trial. Here, the bankruptcy court awarded a damages figure that does not appear to be based on any of the damages models presented.

Rather, the bankruptcy court justified its damages award with a sole citation: a reference to a treatise on uncertainty in damages in Texas law that relied on a handful of decades-old Texas court of appeals cases that

---

[29] *Univ. Computing Co.*, 504 F.2d. at 539.

[30] *Wellogix*, 716 F.3d at 879 (citing *DSC Commcn's Corp.*, 107 F.3d at 330).

[31] 716 F.3d 867 (5th Cir. 2013).

[32] *Id.* at 880.

[33] *Id.* at 879.

No. 13-40751

predominantly involved personal injury torts. The district court affirmed the awards with a citation to one of those personal injury cases. Neither of these citations justifies the damages award here. Even under our "flexible approach" to damages in a misappropriation of trade secrets case, the damages awarded must have some rational relationship to the evidence presented.

Thrasher and Coleman alternatively argue that we should independently increase the damages awarded on the basis of the evidence that the bankruptcy court rejected. We decline to do so.

Because neither the bankruptcy court nor the district court explained the evidentiary and legal basis for the damages awarded, we are unable to review the damages adequately. Because, however, Thrasher and Coleman did suffer some damage, we vacate the award of compensatory damages and remand to the bankruptcy court so that it may either conduct an additional evidentiary hearing on the issue of damages or explain its award of damages on the basis of the evidence in the present record.[34]

*B. Attorneys' Fees*

Mandel challenges the award of attorneys' fees to Coleman. We review the amount of attorneys' fees granted by a bankruptcy court for an abuse of discretion.[35]  In the initial bankruptcy court opinion the court awarded $705,000 to the Law Offices of Elvin E. Smith. Mandel alleges that these fees were errantly awarded on the basis of Coleman's breach of contract claim. But this is incorrect. The bankruptcy court explained in its opinion that the

---

[34] *See, e.g.*, *Lebron v. United States*, 279 F.3d 321, 329 (5th Cir. 2002) (remanding issue of damages because court could not determine, from trial court's opinion, whether the calculation of damages was correct); *Great Pines Water Co. v. Liqui-Box Corp.*, 203 F.3d 920, 925 (5th Cir. 2000) ("Because we cannot determine [the basis for the damages award] we must vacate the award and remand for a partial new damage trial."); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 665 (Tex. 2009).

[35] *In re Repine*, 536 F.3d 512, 518 (5th Cir. 2008).

primary basis for the fees is the theft of trade secrets claim. The court stated that "90% of [the claimed attorneys' fees] relates to their theft of trade secrets claim, which is duplicative (at least in part) of their claim for attorneys' fees and costs based on breach of contract."  In the accompanying order, the bankruptcy court found that Coleman "ha[d] established claims against Mandel for fraud, conspiracy, and misappropriation or theft of trade secrets." The $705,000 in attorneys' fees for Elvin E. Smith could only have been based on the theft of trade secrets claim.[36]  The bankruptcy court did not abuse its discretion in awarding these fees.

*C. Exemplary Damages*

Thrasher and Coleman also assert that courts below erred by failing to award exemplary damages.  Under Texas law, with exceptions not relevant here, "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from . . . fraud . . . malice . . . or . . . gross negligence."[37]  The bankruptcy court held that exemplary damages were inappropriate because the Claimants had failed to prove malice.  But even if the bankruptcy court erred by failing to consider fraud or gross negligence, exemplary damages are inherently discretionary. "[T]he determination of whether to award exemplary damages and the amount of exemplary damages to be awarded is within the discretion of the trier of fact."[38] Claimants have not shown that it was an abuse of discretion not to award such damages.

---

[36] *See* TEX CIV. PRAC. & REM. CODE § 134.005(b) ("Each person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees.).

[37] *Id.* § 41.003.

[38] *Id.* § 41.010.

No. 13-40751

## VII

Thrasher and Coleman argue that emails prepared by an attorney, Jeff Travis, who was then counsel for both White Nile and Mandel, were wrongly excluded by the bankruptcy court on the basis of attorney-client privilege. To reverse based on an evidentiary ruling of a bankruptcy court, the court must have abused its direction[39] and must have prejudiced the substantial rights of the objecting party.[40] Thrasher and Coleman assert that these documents supported their claim for exemplary damages. In particular, the emails "relate to impeaching Mandel about his testimony regarding his knowledge, participation and direction in the [bar grievance] procedure that was filed against Thrasher." However, it is not clear how the admission of these documents would have altered the bankruptcy court's ultimate conclusion. Even without these documents, the bankruptcy court accepted that Mandel's purpose in filing the bar grievance was to "cow Thrasher by threatening his livelihood." Nevertheless, the bankruptcy court declined to award exemplary damages. As we have already affirmed that it was not an abuse of discretion for the bankruptcy court to decline to award punitive damages, the exclusion of these documents, even if erroneous, did not substantially prejudice the rights of the Claimants.

\* \* \*

The judgment of the district court is AFFIRMED in part. We VACATE the award of compensatory damages and REMAND to the bankruptcy court for further proceedings consistent with this opinion.

---

[39] *In re Repine*, 536 F.3d at 518.

[40] *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 265 (5th Cir. 2007).