# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 7, 2022

Lyle W. Cayce
Clerk

No. 20-10908

IN THE MATTER OF: EVERGREEN HELICOPTERS
INTERNATIONAL INCORPORATED

*Debtor*,

ROBERT E. OGLE, SOLELY IN HIS CAPACITY AS LITIGATION
TRUSTEE FOR THE ERICKSON LITIGATION TRUST,

*Appellant*,

*versus*

QUINN MORGAN; KENNETH LAU; UDO RIEDER; CENTRE LANE
PARTNERS, L.L.C.; 10TH LANE FINANCE COMPANY, L.L.C.;
10TH LANE PARTNERS, L.P.; ZM PRIVATE EQUITY FUND I, L.P.;
ZM PRIVATE EQUITY FUND II, L.P.; ZM EAC, L.L.C.,

*Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-1838

No. 20-10908

Before JONES and SOUTHWICK, *Circuit Judges*.[1]

EDITH H. JONES, *Circuit Judge*:

Robert Ogle, in his capacity as Litigation Trustee for the Erickson Litigation Trust, appeals dismissal of his avoidance and recovery claims under the bankruptcy laws. In broad terms, these claims seek avoidance of settlement releases approved in Delaware state court, as well as two payments related to Erickson Air-Crane, Inc.'s acquisition of Evergreen Helicopters, Inc. (EHI) (the "Evergreen Transaction"). After careful consideration of the record and relevant legal authorities, we AFFIRM dismissal of the claims relating to the settlement releases and REVERSE IN PART the dismissal of the payments relating to the Evergreen Transaction itself.

## I.    BACKGROUND

Ogle's avoidance claims turn on two factual events: The Evergreen Transaction and a subsequent settlement agreement resolving direct and derivative claims brought by shareholders related to that transaction.[2] We describe each in turn before discussing the procedural history.

### 1.    The Evergreen Transaction

In May 2013, Erickson purchased EHI from Evergreen International Aviation, Inc. ("EIA") for $250 million. The purchase price included a

---

[1] Judge Gregg Costa was a member of the panel that heard this case but resigned from the court before it was decided. This case is decided by a quorum under 28 U.S.C. § 46(d).

[2] The facts as described herein are taken principally from Ogle's complaint because this appeal arises from a motion to dismiss and, thus, well-pleaded facts in the complaint must be taken as true. *De La Paz v. Coy*, 786 F.3d 367, 371 (5th Cir. 2015) ("On appeal from a motion to dismiss, this court accepts all well-pleaded facts as true and views them in the light most favorable to the plaintiff." (citation omitted)). Appellees sharply contest several facts, including Ogle's characterization of the transaction, and nothing in this section should be construed as deciding any factual dispute.

No. 20-10908

sizeable cash component of $185 million, along with  a $17.5 million unsecured promissory note, and convertible preferred stock valued at $47.5 million.  The complaint alleges Erickson was "cash poor" with less than $1.5 million in "cash and cash equivalents."  Thus, Erickson obtained "crippling debt financing" to purchase EHI that set it "on an inevitable path to financial ruin."  Further—and of particular importance to this appeal—in addition to using this debt financing as consideration for the purchase of EHI, Erickson used it to provide "early payment" on $27.5 million of "unsecured obligations" to ZM Entities.[3]

The complaint alleges at length that Erickson's decision to purchase EHI was the result of deceptive conduct by two conflicted board members, Quinn Morgan and Kenneth Lau, along with Erickson's CEO Udo Rieder.  It is replete with allegations that they "breached their fiduciary duties in causing Erickson to acquire EHI at an inflated price and to incur crippling debt to do so."  The alleged scheme involved a tangled web of interrelated entities.  First, ZM Entities owned a controlling 61% share of Erickson around the relevant time period.  Second, Morgan and Lau "controlled" a "private equity firm" called Centre Lane Partners that was "affiliated with" ZM Entities.  Third, Morgan and Lau possessed "de facto control" of ZM Entities and used it to install themselves and Rieder on Erickson's board of directors.

The complaint alleges that the Defendants' principal motivation in causing Erickson to acquire EHI was to salvage value from debt that ZM Entities owned pertaining to EHI's parent company, EIA.  In short, ZM Entities held approximately $60 million in second-lien debt owed by EIA.

---

[3] Both parties agree the relevant ZM entities are ZM Private Equity Fund I, L.P.; ZM Private Equity Fund II, L.P.; ZM EAC LLC; and 10th Lane Finance Co., LLC.

No. 20-10908

Because EHI (a wholly-owned subsidiary of EIA) was in "severe financial distress" as evidenced by a negative Standard & Poor's recovery rating, the complaint contends the second-lien debt held by ZM Entities was "nearly worthless."

Thus, Erickson's purchase of EHI functioned as "the perfect bailout vehicle" for ZM Entities, allowing them to avoid "a significant risk of loss in connection with their holdings of approximately $60 million in second lien debt" at Erickson's expense. The complaint alleges at least two specific benefits that ZM Entities received from the acquisition.[4] First, it received preferred shares in Erickson valued at $32.9 million "as repayment of their pro rata share of principal of the EIA Second Lien Credit Facility." Second, as already stated, ZM Entities reduced their "debt exposure" to Erickson by receiving $27.5 million in "early payment of outstanding unsecured obligations purportedly owed by Erickson," which constituted a "substantial return" on the subordinated notes "while leaving Erickson's other creditors to serve as bag holders of the newly undercapitalized company." The complaint alleges that ZM Entities subsequently attempted to "unload their entire position in now-undercapitalized Erickson" by selling its shares as evidenced by a filed S-3 registration statement. This "exit strategy" was unsuccessful only after financial website Seeking Alpha published an article titled "Massive Insider Deal Threatens Erickson Air-Crane."

In short, Ogle's complaint alleges: (1) the Evergreen Transaction was a bad deal for Erickson; (2) it was pushed forward by conflicted board members and Center Lane, who "misled" Erickson's "independent Board of Directors"; (3) the debt incurred to facilitate the acquisition "set Erickson

---

[4] Center Lane received $2.5 million in fees for its work on the EHI acquisition, which Ogle also seeks to avoid under the bankruptcy laws.

on an inevitable path to financial ruin" that the Defendants "knew or should have known . . . posed a substantial risk of bankruptcy for Erickson"; and (4) the Defendants attempted to leave other creditors as "bag holders" of Erickson debt by obtaining early payment on their debt and attempting to unload their position in Erickson.

### 2.    The Settlement

In 2013, shareholders brought a class action and derivative suit—alleging, *inter alia*, breach of fiduciary duties and unjust enrichment—in Delaware state court.  The suit implicated the same basic facts described above, and the Defendants in the present case were also defendants in the Delaware suit.  In January 2016, the parties, with the assistance of an experienced mediator, reached an agreement in principle to settle. Erickson's board and its counsel certified that the settlement was "fair, reasonable, adequate, and in the best interests of [Erickson] and its stockholders."  Pursuant to Delaware law, the state court held a fairness hearing to determine whether to approve the settlement.  The court approved the settlement and concluded that the terms were "fair, reasonable, and adequate, and in the best interests of Plaintiff, the Class and [Erickson]."  In September 2016, the court entered an order approving the settlement.

Two aspects of the settlement are particularly important for present purposes.  First, the financial component provided for a total payment of $18.5 million consisting of (a) $2,833,747 to Erickson (20% after fees and expenses) and (b) $11,334,989 to the Erickson stockholder class (80% after

No. 20-10908

fees and expenses). Second, the settlement required a full release of claims against the Defendants.[5]

The complaint criticizes both components. It contends the 80/20 division was inappropriate because the "value of Erickson's claims against the Defendants greatly exceeded the $2.8 million the company received for settling those claims." And it alleges that the releases were "part of a nefarious, unspoken quid pro quo through which: (a) the Defendants were able to obtain releases in exchange for (b) giving Erickson's shareholders a windfall that they would not have received if Erickson had filed for bankruptcy."

### 3.    Procedural History

In November 2016, Erickson filed for Chapter 11 bankruptcy. The filing occurred about three and a half years after the Evergreen transaction and only two months after the derivative action settlement. A litigation trust was created pursuant to the reorganization plan, which transferred to the trustee, Ogle, the right to assert these claims. Ogle's suit asserted twelve counts for avoidance and recovery of various payments and releases on behalf of Erickson creditors. Specifically, the twelve counts fall into three categories:

1. Avoidance and recovery of the shareholder derivative releases to Morgan, Lau, Rieder, and Center Lane as actual or constructive fraudulent transfers under 11 U.S.C. §§ 544, 548, and 550 (Counts 6–11).

---

[5] The release was broadly worded to include "any and all Claims that are based upon, arise out of, relate in any way to, or involve (in whole or in part) any of the facts alleged in the Action, . . . including any and all Claims which are based upon, arise out of, relate in any way to, or involve, directly or indirectly . . . the Evergreen Transaction."

No. 20-10908

2.   Avoidance and recovery, under §§ 544(b) and 550, of payments made in connection with the Evergreen Transaction: Erickson's $27.5 million payment to ZM Entities (Counts 1 and 4); and $2.5 million transaction fee to Center Lane vis-à-vis 10th Lane Partners, LP (Counts 2, 3 and 5).

3.   Objection to claims of the ZM Entities in Erickson's Chapter 11 case under § 502(d) (Count 12).[6]

The bankruptcy court granted Defendants' motion to dismiss the suit. Regarding the claims attacking the settlement releases (Counts 6–11), the court concluded that the constructive fraud claims ran afoul of the *Rooker-Feldman* doctrine because they amounted to an attack on the state court judgment. Alternatively, it concluded principles of preclusion or this court's decisions in *Besing* and *Erlewine* supported dismissal on the merits. *See In re Besing,* 981 F.2d 1488 (5th Cir. 1993); *In re Erlewine,* 349 F.3d 205 (5th Cir. 2003). As for the actual fraud claims attacking the releases, the court concluded that the complaint failed to satisfy a heightened pleading standard for fraud.

Finally, regarding the claims challenging payments that were part of the Evergreen Transaction itself (Counts 1–5), the bankruptcy court concluded that Ogle could not assert these claims because the Delaware judgment "enjoined Erickson's successors and assignees from prosecuting any causes of action relating to the Evergreen transaction."

The district court affirmed on each count for the reasons stated in the bankruptcy court's order and oral ruling. Additionally, it fleshed out *Besing*'s applicability and concluded that precedent barred the "constructive

---

[6] As both parties recognize, this claim depends on the others and, thus, does not require an independent analysis.

No. 20-10908

fraudulent transfer claims related to the Delaware Judgment." Ogle timely appealed.

## II.    DISCUSSION

"On appeal, this court reviews the bankruptcy court's judgment by the same standards that guided the district court scrutinizing the same judgment in its appellate capacity. Findings of fact are reviewed for clear error and conclusions of law de novo."[7] *In re Texas Com. Energy*, 607 F.3d 153, 158 (5th Cir. 2010) (citation omitted).

The claims we must review are the first two sets identified above: Those attacking releases in the Delaware settlement and others seeking avoidance of two payments related to the Evergreen Transaction. We address each in turn.

## A.    The Delaware Releases

For the following reasons, we affirm the bankruptcy court's dismissal of the constructive fraud (Counts 7 and 9) and actual fraud (Counts 6 and 8) claims related to the Delaware settlement.

### 1.    *Constructive Fraud*

The lower courts correctly concluded that the principles set forth in *Besing* and *Erlewine* favor dismissal of Ogle's constructive fraud claims

---

[7] The record is not precise regarding the exact basis in the Federal Rules of Civil or Bankruptcy Procedure for the lower court's analysis. Our resolution, however, derives from Rule 12(b)(6), incorporated under Bankruptcy Rule 7012(b), and considers whether Ogle's complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1973 (2007)).

No. 20-10908

(Counts 7 and 9).[8]  Following those cases, we hold that the Delaware court's judgment approving the relevant settlement agreement after a fairness hearing established reasonably equivalent value for the Delaware releases as a matter of law.

To avoid a transfer as constructively fraudulent Ogle must allege facts showing, *inter alia*, that the debtor (Erickson) "received less than a reasonably equivalent value in exchange for such transfer or obligation."[9] 11 U.S.C. § 548(a)(B)(i).  While this "inquiry is ordinarily fact-intensive," a "[state] court's disposition of the Debtors' claims" can "constitute[] a transfer for reasonably equivalent value as a matter of  law."[10]  *Besing*, 981 F.2d at 1494–96; *see Erlewine*, 349 F.3d at 213 (affirming a bankruptcy court's "finding that the Debtor received reasonably equivalent value as a

---

[8] Like *Erlewine*, we conclude the *Rooker-Feldman* doctrine does not deprive this court of jurisdiction, nor does *res judicata* preclude the relevant claims.  *See Erlewine*, 349 F.3d at 209–10 (recognizing *Rooker-Feldman* "generally should not extend to state decisions that would not be given preclusive effect under doctrines of res judicata and collateral estoppel," and concluding res judicata and collateral estoppel did not apply because the trustee also represented the interests of creditors that were "not represented in the [state court] action").  Thus, we affirm the bankruptcy court based on its alternative holding grounded in *Besing* and *Erlewine*.

[9] *Besing* and *Erlewine* both "rested on an interpretation of the phrase 'reasonably equivalent value' in § 548."  *Erlewine*, 349 F.3d at 211.  The claims in *Besing* were for breach of contract and tort, and the state court's dismissal of those claims with prejudice as a sanction for discovery abuse "effectively appraised" the claims "as valueless."  *Erlewine*, 349 F.3d at 211 (summarizing *Besing*); *see Besing*, 981 F.2d at 1496.  In *Erlewine*, the relevant state court judgment was a divorce decree dividing community assets "unevenly" between the divorcing parties, of which the debtor's portion was deemed "reasonably equivalent value as a matter of law."  349 F.3d at 212–13.

[10] As we recognized in *Erlewine*, this approach "draws modest support" from *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S. Ct. 1757 (1994), where the Supreme Court "held that the price received at a mortgage foreclosure sale conclusively satisfies the reasonable equivalence test as long as the sale was non-collusive and conducted in conformity with state law."  349 F.3d at 212.

matter of law" based on a state court judgment). Significantly, *Erlewine* emphasized the importance of the state court proceedings being fully litigated and without evidence of collusion, sandbagging, or any irregularity before finding reasonably equivalent value. *See Erlewine*, 349 F.3d at 212–13 (concluding that "the Debtor received reasonably equivalent value as a matter of law," and emphasizing that the case "was fully litigated, without any suggestion of collusion, sandbagging, or indeed any irregularity").

The Delaware judgment approving the settlement established reasonably equivalent value for the releases as a matter of law. Critically, the Delaware court was not a passive participant in the settlement process; instead, its "function" was to "consider the nature of the plaintiff's claim, the possible defenses thereto, the legal and factual circumstances of the case, and then to apply its own business judgment in deciding whether the settlement is reasonable in light of these factors."[11] *Prezant v. De Angeles*, 636 A.2d 915, 921 (Del. 1994) (citations omitted). And the court did just that, holding a fairness hearing that considered "the merits of the settlement," and concluding this settlement fell "within a range of reasonableness" that it considered "the gravamen" of the relevant analysis. In its subsequent order and final judgment, the Delaware court concluded that the terms of the settlement were "fair, reasonable, and adequate, and in the best interests of Plaintiff, the Class and [Erickson]."

Nor was there any indication whatsoever of collusion, sandbagging, or other irregularity in the proceedings before the Delaware court. Ogle does

---

[11] *See also Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1283 (Del. 1989) (recognizing the "special role" that the Court of Chancery plays "when asked to approve the settlement of a class or derivative action," and that it "must carefully consider all challenges to the fairness of the settlement but without actually trying the issues presented" while exercising its "considerable discretion").

not allege facts to support a finding, for example, that the settling parties entered into a collusive settlement where material facts were concealed from the state court to obtain its approval. Quite the contrary, Ogle recognizes that the settlement was the result of meaningful negotiation between the settling parties and even quotes excerpts from the Delaware hearing to that effect. For instance, in the fairness hearing counsel told the Delaware court that "the settlement amount was the product of negotiations by the parties" aided by "an assessment of the case by an experienced and highly respected mediator after the parties were unable to agree on a number." Further, the mediator "endorsed the reasonableness of the settlement amount." Indeed, "the settlement very nearly cratered" over allocation of the settlement proceeds; and the parties "fought very, very hard" over the division of the proceeds.

Ogle's efforts to distinguish *Besing* and *Erlewine* give us no pause. First, nothing in those cases supports limiting them to involuntary judicial transfers as Ogle suggests. Rather, *Erlewine* emphasizes the importance of the judicial transfer being of an economic nature, stating that the judicial property division in that case "was above all an economic transaction, *albeit* an involuntary one." 349 F.3d at 212 (emphasis added). The settlement here, too, was an economic transaction vigorously negotiated by the parties and independently evaluated for fairness by a mediator and the Delaware court. Second, this court's consideration of the Delaware judgment does not amount to taking improper judicial notice of the factual findings of another court.[12] Quite the opposite. Like *Besing*, we decline to "look behind" the

---

[12] Ogle relies primarily on an out-of-circuit case in a different context to support this argument. *See Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1082–83 (7th Cir. 1997). But *Besing* and *Erlewine* are factually on-point and precedential decisions this panel is bound to follow under the rule of orderliness.

Delaware judgment to "make an independent evaluation of the claims on their merits." 981 F.2d at 1496. Recognizing the existence and parameters of a state court judgment hardly constitutes improper judicial notice, and that is precisely what this court did in *Besing* and *Erlewine*. Alternatively, Ogle urges this court to distinguish *Besing* on the facts by looking to the "circumstances" around the Delaware judgment and "significant factual issues [that] remain regarding reasonably equivalent value." To do so would be to look behind the Delaware judgment and independently assess its merits, an invitation we have declined. And Ogle has not alleged irregularities or special circumstances that would require reconsidering a heavily negotiated and judicially scrutinized settlement agreement that is quintessentially economic in nature.

Even if we consider the fact issues raised by Ogle, they do not persuade. Ogle raises two issues based on excerpts from the fairness hearing. He asserts that the 80/20 distribution of settlement proceeds was motivated by the fact that "the fox [was] still controlling the henhouse," and the state court judge expressed "serious concerns about the plan allocation" but nevertheless acquiesced and approved the settlement "because there's been no objection to it." As to the first point, the Delaware court's consideration of Erickson's leadership composition when assessing the settlement's fairness is not incompatible with a finding of reasonable equivalence as a matter of law. In *Erlewine*, we recognized that "[i]ntangible, non-economic benefits, such as preservation of marriage, do not constitute reasonably equivalent value." 349 F.3d at 212 (quoting *Hinsley v. Boudloche (In re Hinsley)*, 201 F.3d 638, 643 (5th Cir. 2000) (internal citation omitted)) (brackets in original). But we also recognized that this "sound principle" was inapplicable to a property division that "was above all an economic transaction." *Id.* That proposition is even more appropriate for the quintessentially economic transaction here.

No. 20-10908

Ogle's second point is meritless and misconstrues the record. The Delaware court did not express reservations about the 80/20 division of the settlement proceeds in the fairness hearing. Instead, its "concerns about the plan of allocation" centered entirely on how the shareholders' 80% portion would be distributed. The judge was specifically concerned about "sellers who, as a matter of Delaware law, gave up their Delaware law claims," and expressed concern that the settlement was "going to naturally skew towards larger institutional holders who can more easily maintain and assemble [the required] records." These concerns are irrelevant to our purposes here.

In short, consistent with *Besing* and *Erlewine*, there was reasonable equivalence as a matter of law. The Delaware settlement "should not be unwound by the federal courts merely because of its unequal division of [settlement proceeds]." *Erlewine*, 349 F.3d at 212–13.

### 2.    *Actual Fraud*

Ogle's attempt to attack the Delaware releases as actually fraudulent transfers also fails. We see no error in the lower courts' conclusion that Ogle failed to adequately plead actual fraud, and his arguments on appeal do not convince us otherwise.[13]

The complaint crucially omits any facts alleging fraud on the Delaware court to obtain its approval of the settlement. Had such facts been alleged, they might be considered "independent claims over which the [federal] district court had jurisdiction" because they do "not seek to overturn the state-court judgment" and the injuries did not "aris[e] from the [] judgment." *Truong v. Bank of Am.*, 717 F.3d 377, 383 (5th Cir. 2013)

---

[13] *Besing* was explicit that its holding extended only to constructive fraud claims— not to claims of actual fraud. 981 F.2d at 1496. We decline the Defendants' invitation to extend *Besing* and *Erlewine* to actual fraud under the facts before us.

(concluding *Rooker-Feldman* did not bar allegations that the state court was "misled" into thinking certain evidence was "authentic," and the plaintiff was "misled" into "foregoing her opportunity to dispute authenticity in the state-court proceedings"). The complaint fails to allege such facts here.

At best, Ogle points to various badges of fraud, emphasizing that (1) Erickson had been sued prior to giving out the releases; (2) the transfer was to insiders or their associates; (3) the absence of reasonably equivalent value; and (4) Erickson's insolvency at the time the releases were given. But these so-called indicators of fraud do not hold up to scrutiny. Erickson was technically sued prior to the Delaware settlement, but only as a *nominal* defendant—the relevant suit alleged derivative claims and was effectively brought on Erickson's behalf. The reasonable equivalence argument is little more than an attempt to re-argue the constructive fraud issue in the guise of an actual fraud claim. And the allegation that insiders benefited fails to account for the fact that the substance of the settlement was approved by non-insiders including Erickson's independent directors and legal counsel, the third-party mediator, and the Delaware court. That leaves the allegation of Erickson's insolvency at the time the release was given. Standing alone, this is nothing like the kind of irregularity needed to allege an "independent claim" involving a state court judgment.[14]

---

[14] This conclusion holds true under both ordinary and heightened pleading standards. Thus, we need not reach the issue whether Rule 9(b)'s heightened pleading standard for allegations of fraud applies to fraudulent transfer claims under the Bankruptcy Code. *See* FED. R. CIV. P. 9(b) (requiring allegations of "fraud or mistake" to be stated "with particularity"); *Life Partners Creditors' Trust v. Cowley (In re Life Partners Holdings, Inc.)*, 926 F.3d 103, 117–18 (5th Cir. 2019) (declining to answer this "vexing question" and concluding the relevant complaint was sufficient "under either standard"); *cf.* 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1297 (4th ed. 2019 update) ("Claims of fraudulent transfer or fraudulent conveyance are also subject to the heightened standard of Rule 9(b)."). We further observe that Ogle does not appear to have raised this issue before the lower courts. He contended instead that the

No. 20-10908

## B.    The Evergreen Payments

As we will explain in more detail below, the lower courts erroneously concluded that Ogle was enjoined by a provision of the Delaware judgment from asserting avoidance and recovery claims challenging Erickson's $2.5 million payment to Centre Lane and $27.5 million payment to ZM Entities relating to the Evergreen Transaction. These claims are asserted by Ogle in his capacity as trustee of the post-confirmation litigation trust and assignee of the claims in question. We also reject Defendants' alternative theory that claim preclusion bars these claims. The pleading is sufficient for Ogle to proceed on the $27.5 million payment, but Ogle fails to allege a plausible claim of actual or constructive fraud with respect to the $2.5 million payment to Centre Lane.

### 1.    *Trustee is Not Enjoined by the Delaware Settlement*

The bankruptcy court erred in concluding Ogle was enjoined by the Delaware settlement, as Erickson's successor and assignee, from asserting any claims relating to the Evergreen Transaction. Technically, Ogle is the trustee of a litigation trust created according to Erickson's reorganization plan for the benefit of the debtor's creditors. He is not a Chapter 11 trustee and therefore not endowed with all the statutory powers of a trustee or debtor in possession under the Bankruptcy Code. But although his status is legally different, he was assigned post-petition claims that arose pursuant to §§ 544(b) and 550 of the Bankruptcy Code. Defendants cite no authority suggesting that a state court settlement can bar a successor to the debtor, specifically the trustee of a litigation trust like Ogle, from pursuing claims

---

complaint satisfies the heightened pleading standard. *See Certain Underwriters at Lloyd's v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 273 n.20 (5th Cir. 2020) ("Arguments not raised in the district court cannot be asserted for the first time on appeal." (quoting *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 669 (5th Cir. 2004))).

under the Bankruptcy Code.[15]  Acting in his specific capacity, Ogle is not enjoined by the Delaware settlement from asserting creditor claims that arose only under the Bankruptcy Code.

### 2.    *Claim Preclusion Does Not Bar Claims*

Defendants' argument has some appeal in urging that Ogle's avoidance claims under §§ 544(b) and 548 essentially seek to relitigate the fiduciary breach and unjust enrichment claims resolved in the Delaware settlement.  We conclude, however, that the claims are not barred under a straightforward application of Delaware preclusion law.  *Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd.*, 99 F.3d 746, 756 (5th Cir. 1996) ("We determine the preclusive effect of a state court judgment according to state law." (citation omitted)).

In Delaware, claim preclusion applies where:  "(1) [T]he original court had jurisdiction over the subject matter and the parties; (2) the parties to the original action were the same as those parties, or in privity, in the case at bar; (3) the original cause of action or the issues decided was the same as the case at bar; (4) the issues in the prior action must have been decided adversely to the appellants in the case at bar; and (5) the decree in the prior action was a final decree." *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185,

---

[15] *See also* 5 COLLIER ON BANKRUPTCY ¶ 544.06 (16th ed. 2021) ("Under section 544(b)(1), the trustee succeeds to the rights of an unsecured creditor in existence at the commencement of the case who may avoid the transfer under applicable law."); *In re Moore*, 608 F.3d 254, 260 (5th Cir. 2010) ("Central to this bankruptcy is the trustee's power under § 544(b), which allows him to succeed to the actual, allowable and unsecured claims of the estate's creditors. *See* 11 U.S.C. § 544(b).  If an actual, unsecured creditor can, on the date of the bankruptcy, reach property that the debtor has transferred to a third party, the trustee may use § 544(b) to step into the shoes of that creditor and 'avoid' the debtor's transfer.").  A Chapter 11 debtor possesses all the powers of a trustee under the Bankruptcy Code. *Ad Hoc Grp. of Vitro Noteholders v. Vitro S.A.B. de C.V. (In re Vitro S.A.B. de C.V.)*, 701 F.3d 1031, 1049 n.20 (5th Cir. 2012).

No. 20-10908

192 (Del. 2009). These avoidance claims based on the Evergreen payments fail prong two for lack of privity. As best we can determine, Erickson's creditors, now represented by Ogle, were neither parties nor "in privity" under Delaware law with Erickson, on whose behalf the shareholder derivative suit was filed.

Lacking authority from the state supreme court on the scope of privity, we make an *Erie* guess and rely on "decisions of intermediate state appellate courts . . . unless other persuasive data indicates the [Delaware] Supreme Court would decide otherwise." *Wright v. Excel Paralubes,* 807 F.3d 730, 734 (5th Cir. 2015). An oft-cited case holds that "[p]arties are in privity for res judicata when their interests are identical or closely aligned such that they were actively and adequately represented in the first suit." *Aveta Inc. v. Cavallieri,* 23 A.3d 157, 180 (Del. Ch. 2010).[16] *See also Higgins v. Walls,* 901 A.2d 122, 138 (Del. Sup. Ct. 2005)("[A] nonparty will be bound when its interests were represented adequately by a party in the original suit.").[17] This is broad language, but neither our research nor that of the parties uncovered a Delaware decision in which a shareholder derivative suit sufficed to establish privity between the plaintiffs or the corporation and

---

[16] *See Israel Disc. Bank of New York v. Higgins*, No. CV 9817-VCP, 2015 WL 5122201, at *9 (Del. Ch. Aug. 31, 2015); *Brevan Howard Credit Catalyst Master Fund Ltd. v. Spanish Broad. Sys., Inc.*, No. CV 9209-VCG, 2015 WL 2400712, at *3 (Del. Ch. May 19, 2015); *Sussex Cnty. v. Sisk*, No. CIV.A. 8915-MA, 2014 WL 3954929, at *3 (Del. Ch. Aug. 13, 2014); *Levinhar v. MDG Med., Inc.*, No. CIV.A. 4301-VCS, 2009 WL 4263211, at *10 n.41 (Del. Ch. Nov. 24, 2009).

[17] Recently, the author of *Aveta* purported to retract that decision's broad statement in favor of a narrower formulation of privity. *See In re Columbia Pipeline Grp., Inc.*, No. CV 2018-0484-JTL, 2021 WL 772562, at *18 (Del. Ch. Mar. 1, 2021), *cert. denied sub nom. In re Columbia Pipeline Grp. Inc.* (Del. Ch. 2021), and *appeal refused sub nom. In re Columbia Pipeline Grp., Inc. Merger Litig.*, 249 A.3d 801 (Del. 2021). That decision, however, was unpublished and therefore entitled at most to "great deference" under Delaware law. *See Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1207 (Del. Ch. 1987).

corporate creditors.  Moreover, although both groups may share a common interest in restoring ill-gotten gains from the fiduciary breach of directors, creditors are not "closely aligned" with derivative plaintiffs and may not share in any recovery.  Nor, because they have no direct stake in any recovery, are the interests of creditors actively, much less adequately represented in a derivative suit.

The fundamental divide between the interests of corporate creditors and shareholders/derivative plaintiffs demonstrates why they are not in privity.  Delaware's Supreme Court has clearly differentiated between the claims that may be brought by or on behalf of a corporation against its directors and those that creditors may pursue.  *NACEPF v. Gheewalla,* 930 A.2d 92, 103 (Del. 2007).  In that case, the court rejected creating claims by a creditor for breach of  directors' fiduciary duties toward a corporation with which it had a contract.  The court held it "well established" that directors' fiduciary obligations are owed to the corporation and its shareholders.  *Id.* at 99 (footnotes and citations omitted).  "While shareholders rely on directors acting as fiduciaries to protect their interests, creditors are afforded protection through contractual agreements, fraud and fraudulent conveyance law, implied covenants . . . , bankruptcy law, general commercial law and other sources of creditor rights." *Id.* (footnotes omitted).  Further, state law imposes responsibility on directors "to manage the business of a corporation for the benefit of its shareholder[] owners," and fiduciary duties are imposed on them "when they perform *that* function." *Id.* at 101 (emphasis in original).  Consequently, the court disavowed any direct creditors' claim for breaching fiduciary duties owed to a solvent corporation. *Id.*[18]  From this discussion, the inescapable inference is that shareholder

---

[18] When the shareholder and derivative suits were filed against Erickson, no claim was made of corporate insolvency at that time.  Thus, we need not consider the court's

derivative claims against certain of Erickson's directors are intended to protect the interests of shareholders and maximize value for Erickson. *Id.* at 100 (citing *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 790 (Del. Ch. 2004)). What maximizes value for Erickson as a going concern may or may not maximize value for its creditors, and those creditors must rely on other sources of law for their benefit. Thus, the "interests" of Erickson's creditors vis a vis the corporation's allegedly faithless directors were not necessarily aligned with or represented by the derivative plaintiffs.

As noted by *Gheewalla*, of course, one of the creditors' remedies lay in the provisions of bankruptcy law. Ogle, the litigation trustee for the trust created by Erickson's reorganization plan, succeeded to the right to seek redress for intentional fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 548. The potential overlap with the derivative plaintiffs' previous fiduciary duty breach and unjust enrichment claims is undeniable, but theoretically, the challenged $27.5 million and $2.5 million Evergreen transfer payments to entities controlled by Defendants Morgan and Lau could separately have been deemed in fraud of Erickson's creditors.

### 3.    *Sufficiency of the Pleadings*

Having concluded these claims are not precluded, we turn to Defendants' contention that they fail to sufficiently plead fraud. *Brown v. Tarrant Cnty.*, 985 F.3d 489, 494 (5th Cir. 2021) ("Under our precedent, we may affirm on any ground supported by the record, so long as the argument was raised below." (internal quotation marks, citation, and alterations omitted)). We conclude Counts 1 and 4, regarding the $27.5 million payment to ZM Entities, sufficiently plead claims for actual fraud and recovery

---

additional holding in *Gheewalla* that creditors of an *insolvent* corporation accede to fiduciary duty derivative claims because at that point, "its creditors take the place of the shareholders as the residual beneficiaries of any increase in value." 930 A.2d at 101.

No. 20-10908

pursuant to §§ 544(b) and 550. Counts 2, 3, and 5—alleging actual or constructive fraud with respect to Centre Lane's $2.5 million transaction fee—do not.

### (a)    The $27.5 Million Transfer

Construing the factual allegations in the complaint in Ogle's favor, as we must at this stage, the claims challenging the $27.5 million transfer state a plausible claim of actual fraudulent transfer under §§ 544(b) and 548. Specifically, the allegations are that Defendants obtained early repayment from Erickson on $27.5 million in debt as part of the transaction financing (a) knowing Erickson would at least be placed in severe financial difficulty, and with (b) the intent to jump the queue of creditors. Although this transfer was made in association with financing for the Evergreen Transaction, Erickson used it to satisfy debt owed to ZM Entities (which held a controlling interest in Erickson), but not as consideration for the purchase of EHI. Importantly, the complaint alleges that ZM Entities "received early payment of outstanding unsecured obligations purportedly owed by Erickson," and in so doing left "Erickson's other creditors to serve as bag holders of the newly undercapitalized company" that Defendants allegedly knew was headed toward bankruptcy.[19] The substance of this claim alleges more than bad decision-making by conflicted leaders to Erickson's detriment (as was pled in the Delaware litigation for fiduciary breach and unjust enrichment). Rather, the complaint alleges an attempt to cheat other creditors of their due portion of the debtor's assets, a claim which was not and could not have been addressed by the derivative plaintiffs in the Delaware litigation.

---

[19] These allegations, in fact, are sufficient to satisfy the heightened pleading standard for Rule 9(b). *See* fn. 13 *supra. See Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997) (holding Rule 9(b) requires a plaintiff plead the "who, what, when, where, and how" of the alleged fraud).

No. 20-10908

### (b)    The $2.5 Million Transfer

Not so for the actual and constructive fraud claims challenging the $2.5 million transfer (Counts 2 and 3), as the Trustee's complaint itself is replete with information about the work Centre Lane performed on the transaction. For example, Centre Lane was hired to "provide the analysis of EHI's prospects." It "drove the financial modeling for EHI and maintained full control of that model," and "solicited input from Erickson from time to time with respect to EHI projections." While the complaint alleges these efforts were deceptive, deficient, and caused Erickson real harm, it does not plausibly allege the payment of $2.5 million for this work was part of an actually fraudulent scheme to defraud creditors. Nor does it plausibly allege constructive fraud. It does not, for instance, allege facts to support a finding that a $2.5 million transaction fee falls outside a range of reasonableness for the kind of work performed by Centre Lane with respect to a $250 million transaction. In short, paying Centre Lane for its work—even if it was as deficient and deceptive as the complaint alleges—does not, standing alone, constitute an actually or constructively fraudulent transfer.

### III.    CONCLUSION

For the foregoing reasons, we AFFIRM the dismissal of Counts 6–9 seeking avoidance of and recovery for the releases in the Delaware settlement as actually and constructively fraudulent transfers (and Counts 10–12 as dependent on 6–9). We also AFFIRM dismissal of Counts 2, 3, and 5 relating to the $2.5 million payment to Center Lane for its work on the Evergreen Transaction. We REVERSE the dismissal of Counts 1 and 4 to the extent they allege an actually fraudulent scheme to obtain early payment

21

No. 20-10908

on debt at the expense of other creditors in light of Erickson's imminent bankruptcy.[20]

AFFIRMED in part, REVERSED in part.

---

[20] To be clear, we make no judgment as to whether Erickson's bankruptcy was, in fact, imminent at the time of the transfer, or decide any other questions of fact. Such questions will be explored in future proceedings on remand.